3-1298 DSM Desotech v. 3D Systems 3-1298 DSM Desotech v. 3D Systems DSM Desotech v. 3D Systems 3-1298 DSM Desotech v. 3D Systems  DSM Desotech v. 3D Systems DSM Desotech v. 3D Systems  DSM Desotech v. 3D Systems  Before we start using your time, there's an enormous amount, practically everything in your briefs is designated confidential. Much of it is actually in the district court opinion, which is clearly public, so it can't possibly be confidential any longer. I'm going to ask my questions, and if I tread on something, you're going to have to scream out and stop me, because you way over-designated, and you've made my job today very difficult as a result of doing that. Maybe I could have sent an order out asking you to redo all your briefings, but that seems like a waste of money. Is there a way you could give me a hint right now as to what is really super-duper confidential? Because like I said, a lot of it is in the district court opinion, which is public. Your Honor, we have discussed this between ourselves, knowing that there would be this issue at oral argument, and what is really confidential is the name of customers. Customer name. Okay, great. I won't mention any of those, and if I tread on anything else that seems confidential, either of you, even if you're sitting there, can jump up and wave your arms. That's the only time you're allowed to do that, just to be clear. I actually believe there were two other issues that need to keep confidential. I believe that Desitec wanted to keep the pricing of its resin confidential, and 3D Systems would like to keep its licensing rate confidential. What about market share information? As far as I know, that does not need to be kept confidential. Okay, so I'm going to write it down. Say it again. So Desitec wanted to keep the price of its resin confidential. Price of resin, got it. 3D Systems wanted to keep its licensing rate confidential, and customer names need to be kept confidential. Okay, I think I can stick with that. That's much narrower than the universe that is claimed in your briefings. Okay, go ahead. You may proceed. Thank you. May it please the Court. The briefs in this case tell two very, very different stories, and the question is whether it was appropriate for the district court to decide whose version was correct, or whether a jury should have made that decision. And I think you have a good example in the rule of reason analysis. 3DS says in its rule of reason analysis that it was clear that the RFID lockout was a pro-competitive advance in the art, and that the only reason Desitec was discomforted by it was that it refused to enter into a licensing rate. But the jury could have found differently. Could have found that the purported justifications for the RFID lockout were a sham, a pretext, and that there was no legitimate business reason for the lockout. And the jury also could have found that this was the only way that 3DS could find to exclude its competitors, and a way to monopolize the resin market. Now, the district court in 3DS argues that this case is just like the Ninth Circuit decision in the Tyco case. But there are very important distinctions between this case and that one. Because in the Tyco case, you had Tyco coming out with a new machine, and you had sensors, generic sensors, that could no longer work in it. Here, a jury could have found that Desitec's resins would work, and would work perfectly fine in the machine. The only reason they couldn't be used in the machine was that you had this lockout. Well, it's summary judgment, and your evidence, and allegations and evidence thus far are that the resins would work. Right? Because I understand their allegations are that this is for quality control reasons, that some of the resins won't work. But since it's summary judgment, I have to accept, as gospel, your version of all these things. Right. Absolutely. And there is evidence that it did work before the lockout was enabled, and that it would work. And there's no expert evidence on their side that it won't. Can I ask you to turn to relevant market? Yes. Because if you didn't prove a market, you're out to sea without a paddle on the federal plane. So tell me why SL machines should be a market unto themselves, because the regional circuit case law certainly indicates that constricting a market all the way down to an individual product is a very unusual thing and requires a high level of proof. Right. The question is whether 3DS has sufficient market power so that it could raise prices, coerce customers in the market for resins. That is the basic question here. And the evidence, there's a great deal of evidence that it could, and in fact it did coerce customers into taking resins they didn't want because they had to have the stereolithography technology. Yes, but you have to prove either cross-elasticity or what is it, how are you proving which market is the relevant market? You actually allege two possible relevant markets, so pick one of them and tell me which one you think is the best. The market for the large stereolithography machine here, the testimony is that there's no substitute, there's no substitute for that technology for a large number, a significant number of uses. So you have that testimony. You have testimony from our four customers who said that even if the price was increased 5% to 10% of those machines, it wouldn't make a difference to them. They have to have that technology. So you have that, and they are 12% of the resin market, those customers. There were four or five of them? There were four of them. I recall, and correct me if I'm wrong, please, the testimony was the effect that other duplicative, I'll call it technologies, I'm sure that's not the best word for it, but just for the purpose of this question I'll use that, that other duplicative types of technology were fine for certain purposes, but not for other purposes. Right. And where does that leave us? Is that a question for the jury to decide how the market's defined when you're looking at it from that viewpoint? Yes, because here it's a question of can you coerce people to take resins they don't want? Can you raise prices in the resin market? Do you have market power in this market as we've defined it for stereolithography machines? And the evidence is that those machines are more expensive than other alternatives, that we've got our hypothetical monopolist argument that people would take a 5% to 10% price increase without batting an eyelash. That's based on the four customers. Based on the four customers. One thing I want to correct, you said 12%. It's not 12% of the SL market. It's 12% of the resin. Why do we care what percentage it is of the resin market if you're talking about the relevant market being SL machines? Because these are people who buy a very large part of resin. They're your largest customers and they are therefore representative of the market. No, they're not representative of the market of the people who are buying the SL machines. They're representative of the market of the people who are buying the resin. Right, but that's not the market. You're alleging the market is the machines, so what percentage are those four people of the people who bought the machines? The question here isn't who's going to buy resin. The question is, would the same person buy the machine if it cost 5% to 10% more? Right, but that's one piece of evidence. What percentage are they of the machines? There's 287 some, if you do it by customer. There are a small number of customers, but they are the largest users. And the question is not, are they... Do you know by volume what that universe represents? By volume of the SL machines. I do not know that, to be honest. But the question is whether they are representative of customers in general. And we have evidence here. Again, it's not just the hypothetical monopolist. There is a great deal of evidence. There is the price of the machines, the testimony from other customers as well, that they cannot substitute for certain uses, so they have to have the machines. The fact that they were able to coerce customers to take resins they did not want. That alone shows market power. And our expert went through and analyzed all these facts together, rather than pulling out one or two facts, which is what 3DS would like to do, and concluded that they show that 3DS not only had market power, but exercised it. Your argument is that 3DS has market power in the time market, which in this case is the SL machines. Right. And you're not making an argument with respect to market power in the time market, namely the resin market. Right. Well, yes, that they have market power in the time market, which they used in order to increase their market share in the time market, and most blatantly used by engaging this RFID technology, where they said, you can't use any resins that we haven't approved. Even though there's evidence of that with the sham, that was a pretext for just trying to push their competitors out of the resin market. Let me ask you a question on something that's kind of concerned me throughout the case. The SL machines, there's only one producer of those, correct? Yes. And is that because that producer has the patent on that machine? Is that a patent issue? Although they were required to license it to another competitor several years ago, no competitor has come into the US market. So there is no competitor for stereolithography. And so that's another factor. But why wasn't that argument made, that the existence of a patent on the SL machines was used to leverage the tie-in arrangements for the resins? Well, I think that argument was made that they have a monopoly. Because of a lockout feature. Right. That they have a monopoly in the SL, which they admit that they do. They have a monopoly over SL machines. That technology is still the leading technology 3DS has. Back to the relevant market, the question is whether there's a reasonable substitute for that product. I mean, that issue gets down to that. And from what I recall, there was testimony that there were substitutes for the product for certain purposes. For certain purposes, right. Did the district court ever make an actual ruling on whether those substitutes were reasonable? Well, what the district court said is that our testimony that there is no substitute, and we have a number of customers who said that, that there is no substitute, wasn't good enough because the people didn't testify that there was no reasonable substitute. Because they weren't asked whether. Whether there was, using the word reasonable. But what they said is there is no substitute. Isn't there another way of looking at that, that if there's 287 members of the market, or companies in the market, and you only brought forward 12, or I forgot the exact number. Not of those 12, only five testified as to the reasonableness of the substitute. And out of those five, there was only two that said that there's no substitutes in the market. Can't you look at it and say, well, there's only 2%. You have evidence of only 2%. And that's not showing a reasonable substitute. That doesn't rise to the level. Well, Your Honor, we had more customers who testified that there was no substitute. We also know that this is expensive technology, which has not been pushed out by the cheaper technology. So if there were reasonable substitutes, as their expert says, then why wouldn't people be buying 3D printers, which are $10,000, instead of paying nearly a million dollars for one of these machines? And that is because there are a number of uses, many uses, that you just don't have any substitutes for. And that gives them the market power, and gave them the market power to coerce their customers to buy 3D printers. What's the relevance of the service bureaus having more than one type of machine? Well, because there are different types of machines that are good for different types of applications. So yes, there are overlaps. If you were doing a Venn diagram, there would be overlaps. But the problem on the relevant market that the judge said is that there is a large area where there's no substitutability. And if you can't substitute something else, then they have market power. And again, I go back to the fact that they were able to coerce customers who said, I want to use different resins on this machine. You're into your rebuttal time. Would you like to save the rest? Yes. OK. Thank you, Brenda. Here from the other side. Thank you, Your Honors. The district court's opinion should be affirmed because Desitech simply did not bear its burden of proof at the summary judgment stage. Desitech was required to come forward with sufficient evidence to support a jury finding on every issue in this appeal on the relevant market for systems, the relevant market for resins, for the pro-competitive benefits and antitrust injuries. It failed to do that. I'd like to start with the relevant market for systems. What Desitech did was come forward with anecdotal evidence from 12 customers, 13 witnesses from 12 customer companies, who made different statements about the alternatives to stereolithography. Five of them said that there are indeed alternatives to stereolithography. For some uses. Pardon? For some uses. For some uses. For the large printing stuff, nobody said there was any substitutes, right? What is it? What is the stuff for which there are no substitutes? I wish I understood the technology better, to be honest with you. Well, I think it's a problem, again, in Desitech's brief, because in their reply brief, they've come forward with this theory that there are certain uses for which stereolithography is indispensable. The only place that can do it. And that's what they say. And they don't identify what those uses are. But to be clear, I understand they don't identify the uses, but their experts and many of their witnesses said the same thing, maybe equally conclusively. I still don't understand what the uses are that only SL can do apart from large printing or printing that needs a fine degree of detail. But those are uses, right? I mean, if you want to print something big and this machine is the only thing that can do it, then there isn't a substitute for it. Well, there are only four customers who said that they could not substitute away from stereolithography. And there were five customers who said, yes, there are alternatives to stereolithography. Alternatives for some uses. So let's take the hypothetical that there are uses for which you can only use stereolithography. It's indispensable. The question is, how many? How many customers have those uses for which stereolithography is indispensable? They're not telling us. 268 apparently do, or 287, right? And here's why. The machine costs a million bucks. The alternatives are $10,000. I mean, if not, the boards of all those companies should take all of the CEOs to the SEC for criminal charges. I mean, if you could substitute for $10,000 instead of spending between $179 and $1 million, I hope that was not something I wasn't supposed to say. No, no. If you could substitute for $10,000 instead of spending all that money, how could you not do it? And if you could, then your question would be at. If you could do that, then that would be correct. But DozeTech has simply misstated the evidence on that point. Its expert included a chart, tab four, at page 2925 of the appendix. Its expert included a chart that shows all of the different technologies and their price tags. And those price tags do not stop at $59,000. They go up over a million dollars. EOS is a company that makes laser sintering systems, and its systems cost anywhere from $220,000 to over a million dollars. Many of the systems on this page, 2925 of the appendix, many of these systems are in the $400,000 to $500,000 range that 3D system stereolithography systems are in. And so when DozeTech says that the range stops at $59,000, that is not supported by any evidence. It is controverted by its own expert's report, and that does not create a genuine issue of fact as far as summary judgment. Ms. Werner, is your argument that you have two experts here, Dr. McKee Mason and Dr. Carlton. These are the two experts. Both, I think we all agree, eminently qualified in their fields. Is your argument that Dr. McKee Mason on his side, which is I guess the plaintiff's side, didn't have an adequate factual basis for his opinions? In other words, there wasn't a large enough sampling. Is that your argument? Yes, that is absolutely one of the reasons why we think his work can't be accepted. But if you would say, would you say though that the expert opinions on themselves do not create an issue of fact? In other words, you have two eminent experts here. You have reports going back and forth. Isn't that a jury issue? It's not in this case because, and the district court did not rely on our expert's report at all. Our expert's report can be completely set aside for the purposes of the summary judgment. The question is only whether Dr. McKee Mason supported his opinion with sufficient evidence to have produced a plausible opinion. You're saying his sampling was too small? Is that the idea? Well, there are actually two problems with his sampling. First of all, it was too small. Four customers said that they would not substitute in response to a price increase, although one of those customers said that when he was buying a system, 3D Systems had to give him a 5% discount to make him buy a machine. His words, to make me buy a machine. But four customers. The other problem with Dr. McKee Mason's testimony is that he himself said that these customers, the customers who testified, are not representative of the rest of the 268 customers in the customer universe. And I'm citing to the appendix at pages 2765 through 68 and 12,268 to 69. Dr. McKee Mason said that no meaningful comparison could be made between these customers who testified and the rest of the customers. 12,268 through 69. What was the first one? 2765 to 68. And what is it that these pages are going to tell me? These are pages from Dr. McKee Mason's report in which he said that Dr. Carlton's opinions had to be rejected, could not be accepted, because Dr. Carlton was doing a comparison of the so-called constrained customers versus all other customers. Dr. McKee Mason said that these two groups of customers were so different that you could not make a meaningful comparison between them. And so that shows that these, if we're, that is Dr. McKee Mason, and does a text evidence saying that these customers, the constrained customers, of whom almost all of the 13 customers are a part, the constrained customers are not representative of the rest of the universe. So his opinions cannot be accepted with regard to the relevant market, not only because the sample was anecdotal, too small, cherry-picked, but also because they were not representative. Somehow I have not followed you. So slow it down and back it up. Sure. Their expert said that the four customers are not representative is what you're telling me? Their expert said that, so there was a group of customers that came to be called the constrained customers. These are the customers that Desitec believed it would be selling resins to for their RFID-enabled machines, but for the use of RFID. But I guess, why do we, I don't care about the constrained customers. What I care about is did they establish a relevant market, and for that, all I care about is cross-elasticity or the five to 10% rule or substitutability. So what their four people said is no substitute. So what are you going to tell me about that? What I'm going to tell you about that... You've got to make it simple for me, obviously. Certainly. Well, it's a complicated set of legal problems here, but the four customers are among the constrained customers whom Dr. Mackey-Mason said are not representative of the rest of the customers. So these four customers, and so these four customers, let's take for the sake of argument that they cannot substitute to any other machine. They are four customers out of 268. They are not representative, and in addition to that... I mean, they're not representative, but they have to be not representative for what purpose? They're not representative because they're all women. What does that mean? What does that have to do with the relevant market? You know, I don't understand yet... Okay. ...what your argument is making. Well, and I think that's because there's another piece of this puzzle that Desitech has not put forward that it needed to put forward to go to a jury, and that is, the question is, can enough customers substitute to make a price increase of 5% to 10% unprofitable for 3D systems? And there is no evidence in this case about how many enough would be. Is it four? Is it 50? Is it 100? We don't know. They didn't put forward any analysis, any evidence. They have the transaction data for every system sale we ever made. Can we go back, though, to 2925? Because you totally, honestly blew my mind. This is not cited in your brief. Why not? It is cited in our brief in the facts section, Your Honor. Really? I bought in to the $10,000 to $59,000 thing, hook, line, and sinker, before right now. So how did I miss this? How did I miss the fact? It's in our facts. It's on page 11 of our brief. We addressed it. So explain it to me, because I obviously completely misunderstood the factual record on this point. So explain to me what 2925 tells me about the substitute technology. 2925 is a list of some of the substitute technologies and it is a chart from Dr. Mackie Mason's report as a tech economist. And he was showing what the different technologies are, what their build sizes are, their build volumes, because it's certainly not fair to compare a system with a very large build volume to a system with a very small build volume. And then it's got the list prices for all of these equipments from different suppliers. And when you look at this chart, you see that the prices go as high as over $1 million for EOS sintering systems. You see that Stratasys has systems in the $350,000 to $450,000 range, which is the same range as 3D Systems' iPro systems. So what this chart shows you is that there are a variety of different systems at many different price points, and that 3D Systems have competitors at every price point and every build volume. What about the evidence that was presented regarding the service bureaus and the amount of SO machines that they have? Doesn't that indicate that there's a relevant market? It does not, Your Honor. And it's an interesting market. Why is that evidence not representative? Well, service bureaus have RFID-enabled stereolithography machines, non-RFID-enabled stereolithography machines, sintering machines, FDM machines, DLP machines. They often have a variety of machines. So if all of these purposes or machines are substitutable, then why have all these different machines? Why wouldn't you just have one machine? Well, it's very much like the IGT gaming case in that what you have are differentiated products. And so do consumers have a particular preference for the capabilities of this machine versus that machine versus another machine? Perhaps. But do they all compete with one another? Yes, to an extent, but not necessarily 100%. So a service bureau can say, I need to make a part that's highly durable. I can do that on stereolithography, or I can also do that on a sintering machine. I can also do that on a Stratasys FDM machine, and I'm going to have a durable part. Now, the service bureau may say to themselves, right now, my stereolithography machines are really busy with jobs already, and I don't want to divert any of that business away to do this durable part. I'll just do it on my Stratasys machine. I'll just do it on my sintering machine. So they have a variety. It's very much like in the grocery store. You have a variety of different kinds of soda. It doesn't mean that they're in different markets. It just means that, to some extent, people have a preference for this, preference for that. Just as in the continental can case, glass containers and metal containers may very well not be able to satisfy all of exactly the same uses, but that doesn't mean they're not in the same market. What you have to look at is the extent to which they compete, and that's what Desitec did not do. It did not show the extent to which they do or do not compete, the extent to which they would have to compete in order to be in the same market or not be in the same market. We just have no quantification of that at all. So a jury would say, for customers, they're not representative based on the economist's testimony. We've got some anecdotes where customers say, yes, they are alternatives in some situations. No, they're not in some situations. What would the jury do with that? They don't have any benchmark by which they can decide whether enough to answer that key economic question, as Desitec's economist put it, can enough customers substitute. That's the question. I'd also like to turn to the pro-competitive benefits discussion very briefly. And I think the heart of the problem with Desitec's case in this, with regard to the pro-competitive benefits, and in fact, really in this whole case, is that Desitec is challenging treaty system licensing arrangement as bogus. Bogus is Desitec's word. But I'd like to point out another misstatement of the evidence that Desitec has made that really gets at the heart of the problem here. In its opening memorandum at page 57, Desitec makes this statement. Desitec, quote, has always and continues to develop and supply its own SL resin style files, end quote. But it cites to the statement of facts appendix pages 7304 to 05. And here's what Desitec, the admission that Desitec actually made in the statement of facts. Quote, Desitec developed style files for use with its resins through modification of existing style files published by 3DS, end quote. Again, that's at 7304 through 05 of the joint appendix. Now, it's undisputed that 3D Systems has a staff of engineers who perform extensive testing of resins to qualify those resins for use in its system. It's undisputed that the result of that qualification process is a set of style files that is unique to each resin and each machine. So let's take one of Desitec's qualified resins, 11120. You can't just take the set of style files that was developed for 11120 on the iPro 5000 and copy it over to the iPro 7000. They have different capabilities, different lasers, different parameters. The style files are different. And 3D Systems invests not only its money and those engineers' time, but also its know-how, its trade secrets, its secret processes. It invests a lot in creating those style files. And what's going on here is that Desitec wants a free ride on that. It wants 3D Systems to have to pay for that not only for itself, but also for 3D Systems, or for Desitec, while Desitec sells resins without having to bear any of that cost. And the fact that Desitec puts in its opening memorandum... Your prior systems would allow any resins to be utilized. Because 3D Systems qualified every resin and created those style files for those older machines for every resin, its own resins and Desitec's resins. So those same style files still exist for those same resins? You can just put them on this machine. It's not a matter of creating new ones? It is a matter of creating new ones. The style files are specific to each machine. The new machines, the new RFID-enabled machines have different lasers. Again, it's undisputed that there are a number of parameters on the new machines that did not even exist in the old machines. So it is not a matter of taking style files from one machine and putting them on another machine. You can't do that. This seems like a fat question to me. It's undisputed, Your Honor. If you look at the record, it is undisputed. I submit to this court that there is not a disputed material fact in this case. Of course you do. Of course I do. But I would urge the court to do what I know the court will do anyway, which is look at the underlying evidence. When Desitec says there's a disputed issue of fact, look at it. Look at the chart. Look at its admission that it needs to use 3D Systems style files and 3D Systems work to create its own style files. It doesn't say that in its briefs. And so it looks like it's trying to create the appearance of an issue of fact. But if a plaintiff could just misstate the facts and avoid summary judgment that way, we'd have no summary judgment at all. That's not a genuine issue of fact. Desitec says that all of its resins were used on the Viper Pro prior to the implementation of RFID, routinely, without trouble. Desitec says that. But when you look at Desitec's evidence and you see what is it they're citing for that statement, you see that they actually only show evidence that two customers used resins, the 18420 resin and the 11122 resin on the Viper Pros prior to the implementation of RFID. You have a final thought. You're pretty far over your time. So those customers do not demonstrate that all resins were used successfully. They don't even demonstrate that one of those customers was used successfully and the other one had to modify 3D system style files to make it work. So I would, in closing, urge the Court to look at the evidence and you will see that there are no disputed issues of material fact. Thank you, Your Honor. Thank you. Your Honor, I'd like to address the chart that counsel talked about at 2925. That wasn't an argument made in the brief. And if you look at this, if you look at the comparison, if you look, for example, at the large build envelope comparison, which is 25 by 29 by 11 size, you'll see that the stereolithography price is 550,000. Laser sintering is one million. DLP is 300,000. And what that suggests very strongly is that they don't compete with one another. Well, the selective laser sintering goes up over a million dollars. Right. There are some, but the evidence from the customers in this case is that laser sintering can't be used for the same things that you use stereolithography for. So they may have a million dollars. Not for all the same things, but for some of the same things. Perhaps for some of the same things. But there are some things. So you have to have the stereolithography machines. And they're not competing for the same, they are not, it gives them the ability to raise prices and to use their monopoly over that to coerce residence purchases. But what counsel is asking this court to do, really, is to weigh the evidence. And that's what a jury's for. It's not for a court to weigh the evidence. When you look about, did we have enough evidence, counsel says we didn't have enough evidence to show that there was a relevant market here, that there was no substitutability for important uses. But we have testimony to that effect. We have testimony, there's no reason why it's not representative. We have confirmation from various types of evidence. Our expert looks at all of it and he says, this tells you this is a relevant market. Now, maybe we won't win if we bring that to a jury, but it was for a jury to decide because it goes to the weight and not to whether or not we've properly supported a claim. We also have to take into account that there were limits on what we could do in terms of deposing customers. There were 60 depositions taken in this case. Plus the fact that we had, during this whole period of time, 3DS was going around and buying up service bureaus, so right before we were to depose them. Discovery is complete and done? Discovery is complete, yes. So if we were to find in your favor and send this back for a trial, it would just move forward to trial. Discovery is already complete. Well, we've also had two or three years since Discovery was completed by the time we would get there, so there may be new evidence, certainly on issues such as antitrust injury and damages. There would be new evidence of what happened in between. And in this case, given the differences between the machines, I think Dr. Mackie Mason's analogies are very helpful to say that it is fine to say that for some purposes, bicycles and automobiles compete with each other, but no one would ever say that they are part of one relevant market. And that if we had a monopoly in automobiles, if somebody, only Toyota, sold automobiles in the United States, that they wouldn't have market power to coerce people if they started saying you can only use Toyota-approved gasoline in your cars. And that's our situation here. Do you have a final thought you want to... Your Honor, just one final thought on the question of whether we... I'm sorry. On the style file point that the counsel made, they have never claimed any intellectual property in their style file. They've always been open to customers to use, and that is how Desert Tech has competed for years and years. They're still not claiming any intellectual property. So that licensing arrangement that they wanted us to do was simply a way of precluding us from competing in the red market. So we'd ask Your Honor to reverse the judgment of the law. I thank both counsel for their argument. The case is taken under submission.